COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

|  | § |  |
| --- | --- | --- |
| ROBERTO VALDEZ, | § | No. 08-10-00331-CR |
|  | § |  |
| Appellant, | § | Appeal from |
|  | § |  |
| v. | § | 171st District Court |
|  | § |  |
| THE STATE OF TEXAS, | § | of El Paso County, Texas |
|  | § |  |
| Appellee. | § | (TC # 20080D04281) |

**O P I N I O N**

Roberto Valdez appeals his convictions of capital murder (Count I) and aggravated assault (Count II). A jury found Appellant guilty of both offenses and further found that he used or exhibited a deadly weapon during the commission of the aggravated assault offense. The trial court assessed Appellant's punishment at life imprisonment on Count I and imprisonment for fifteen years on Count II. The trial court included an affirmative deadly weapon finding in the judgment related to Count II. For the reasons that follow, we affirm.

**FACTUAL SUMMARY**

In June of 2008, twenty-year-old Ana Sarahi Hernandez ("Sarahi") was dating Jorge Cardenas. On Saturday, June 14, Sarahi attended a family get-together at his house. Sometime during the evening, Sarahi became jealous and got into an argument with Jorge because he had received a text message from a female friend inviting him to go somewhere with her. Sarahi got into her vehicle and left the party.

Sarahi's fourteen-year-old sister, Crystal Nesbitt, was waiting for Sarahi to return home from the party so that they could watch a movie together. At approximately midnight, Crystal saw the headlights of Sarahi's car outside, but Sarahi just left her car at the house and never came inside. She also heard a second vehicle which she recognized as Appellant's car. She was familiar with the sound of his car because Appellant had been to the house before to visit Sarahi. Sometime thereafter, Crystal fell asleep.

Sarahi telephoned Jorge several times between 2 and 3 a.m. and they continued to argue. In the final call which ended around 3 a.m., he convinced her to return to his parent's house because the party had not ended. He understood from their final conversation that Appellant was going to bring Sarahi back to the party but she never returned. Jorge knew that Sarahi and Appellant were friends. Jorge called Sarahi's home at around 4 a.m., but no one answered the phone.

The following morning, at approximately 6 a.m., Crystal and Sarahi's mother, Maria Nesbitt, woke up Crystal because Sarahi had not come home. Crystal and Maria called Sarahi's friends, including Jorge, to find out if anyone knew where she was, but no one had seen her. Around 9 a.m., Crystal, Maria, and Sarahi's friend, Brenda, went to find Appellant's house and look for Sarahi there. Crystal and Maria did not know where Appellant lived but Brenda remembered the street he lived on because she and Sarahi had driven by the house once while on the way to the store. Once they were on the street, Maria, Crystal, and Brenda found the house because they recognized Appellant's car in the driveway. They rang the doorbell and knocked on Appellant's door and windows, but no one answered. They continued knocking and ringing the doorbell for about thirty minutes before they gave up and left. Crystal and Maria returned home to wait for Sarahi. When Sarahi hadn't arrived home by 12 p.m., Crystal and her mother

returned to Appellant's house. Once again, they rang the doorbell and knocked on the windows. Crystal became increasingly worried that her sister was in the house so she hopped a fence into the back yard and started looking in the windows. Crystal saw Appellant and Sarahi sitting on the floor outside of the bathroom. Crystal testified that her sister was moving her arms up and down and it looked like she and Appellant were arguing. She could not hear the conversation, but Sarahi appeared to be scared and was screaming at Appellant. Appellant was saying "No" and getting in Sarahi's face. Crystal knocked on the window to let them know she was there. When Sarahi looked up and saw Crystal, she appeared to be surprised and Crystal saw fear in her sister's eyes. At that point, Crystal ran back to her mother and told her to call the police. From the front door, Crystal could hear her sister screaming and crying from inside the home. It sounded as though Sarahi was running through the house and Crystal could hear Sarahi screaming, "No, Roberto, no." Crystal began trying to break into the house and she discovered a front window which was partially open. She removed the screen and ran into the house.

Once inside, Crystal grabbed a beer bottle off the coffee table and she could hear Sarahi screaming her name from upstairs. With the beer bottle in hand, Crystal ran upstairs toward the sound of Sarahi's voice. She noticed one room with the door shut, so she opened it and went inside. Crystal saw her sister sitting on a bed, covered in blood and Appellant was standing beside her. Appellant was holding Sarahi by the hair with his left hand and he had a knife in his right hand. Crystal saw cuts on Sarahi's chest so she tried to move closer to help her. As Crystal approached, Appellant swung the knife at Crystal and cut her. Sarahi tried to stop Appellant by pulling on the back of his shirt and saying, "No Roberto, not to my sister." Crystal asked Appellant why he had done that to Sarahi, and he responded by saying that he was going to let her go but he got scared when they showed up at the house.

- 3 -

The police arrived at the house and were met by Maria, who they described as frantic, hysterical, and screaming. They heard someone screaming inside of the house so they entered and ran upstairs. They saw a young woman covered in blood on a bed and a second female also on the bed. Appellant was standing near them with a knife clenched in his hand. They identified themselves as police officers and ordered Appellant to drop the knife. Appellant dropped the knife but resisted the officers' efforts to handcuff him. After they handcuffed him and removed him from the room, Office Ricardo Huante observed that Sarahi was bleeding profusely from stab wounds to her chest and umbilical area. Huante attempted to aid Sarahi until EMS arrived by putting pressure on her wounds. She told him several times that she was dying. In an effort to keep her conscious, Huante asked Sarahi what had happened. Sarahi told him that she had gone voluntarily with Appellant but when she wanted to leave, he refused to let her go. When her mother arrived, Appellant refused to let Sarahi leave and he became angry and began to stab her. Huante maintained pressure on the wounds until EMS arrived. EMS transported Sarahi to the hospital where she underwent immediate surgery to insert chest tubes and to treat the stab wounds to her neck, abdomen, chest, back, right shoulder, right arm, and hand. After the surgery was completed, there continued to be active bleeding in the left chest cavity and Sarahi suffered cardiac arrest. She was resuscitated and returned to surgery where it was determined that the left lung and the posterior chest wall stab wound were bleeding. The surgeon sutured the lung and stab wound and added two more chest tubes to the left side of Sarahi's chest. The following day, Sarahi went into a coma as the result of hypovolemic shock. She was declared dead the following day.

The medical examiner's office performed the autopsy. Dr. Juan Contin did not perform the autopsy, but he reviewed the medical records and autopsy report and offered his expert

medical opinion that the victim bled to death as a result of multiple stab wounds. Dr. Contin also reviewed a peer review report which evaluated the medical treatment of Sarahi Hernandez. The peer review determined that the hospital could have prevented the death of the victim by appreciating the significance of the blood loss through the chest tube.

Jessica Gausin and her boyfriend, Luis Martinez, testified for the defense. On June 14, 2008, Gausin and Martinez went to Appellant's house. Gausin recalled that they went to his house at approximately 11:30 p.m. but Martinez testified that it was 9 p.m. Appellant left the house after receiving a phone call and he returned with Sarahi who was crying. Martinez testified that Sarahi was dating Appellant. Gausin and Martinez left at around 3 a.m. and Sarahi remained at the house. Neither of them saw Sarahi being held against her will.

Dr. Leann Grossberg, an expert in forensic pathology, reviewed the autopsy report, the police reports, and the medical records. The record of admission showed decreased breath sounds on her right side, insertion of a right-chest tube, and normal breath sounds on her left side. Dr. Grossman did not find any evidence of a pneumothorax in the left chest cavity. In her expert opinion, she did not see any clinical indication to put a chest tube in the left chest cavity. Sarahi had nine stab wounds but six of them were into tissue and did not cut any major blood vessels. The stab wound to the abdomen was potentially fatal but Sarahi had received prompt medical attention and the bleeding from that wound had been stopped. If the bleeding from that wound had not been stopped, it would have been fatal. Dr. Grossberg questioned whether the bleeding in the left chest cavity had been caused by the stab wound to the left side of Sarahi's back or by the placement of the left chest tube. Based on her review of the post-operative chest x-ray, Dr. Grossberg could not rule out the stab wound to the back as the cause of the bleeding but she felt that it was unlikely. She admitted that death from improper placement of a chest

tube is rare.  Dr. Grossberg also testified that Sarahi would have died as the result of bleeding from the stab wounds if she had not gotten medical treatment.

The jury rejected Appellant's defense and found him guilty of causing the death of Sarahi Hernandez by stabbing her with a knife while in the course of committing or attempting to commit the offense of kidnapping.  The jury also found him guilty of aggravated assault by causing bodily injury to Crystal Nesbitt by cutting her with a knife.

## ADMISSION OF DYING DECLARATION

In Issue One, Appellant argues that the trial court erred in admitting Officer Huante's testimony regarding statements Sarahi made to him because it violated his right to confrontation guaranteed by the Sixth Amendment.  The State makes several arguments in response including that Appellant waived his right to confrontation by wrongdoing, Sarahi's statements were non-testimonial, and the statements were admissible as a dying declaration.  It is unnecessary to address the State's assertions that Sarahi's statements are non-testimonial or that the forfeiture by wrongdoing exception applies in this case because we conclude that the trial court properly admitted the statements as a dying declaration which is an exception to the right of confrontation.

Generally, a trial court's decision to admit evidence is reviewed for an abuse of discretion.  *Prible v. State*, 175 S.W.3d 724, 731 (Tex.Crim.App. 2005).  Whether an out-of-court statement is admissible as an exception to the hearsay rule is a matter within the trial court's discretion.  *Zuliani v. State*, 97 S.W.3d 589, 595 (Tex.Crim.App. 2003).  The trial court abuses its discretion if the decision lies outside of the zone of reasonable disagreement.  *Id.*  An appellate court engages in a *de novo* review when determining whether the admission of a declarant's out-of-court statements violate the Confrontation Clause.  *Lilly v. Virginia*, 527 U.S. 116, 136-37, 119 S.Ct. 1887, 1900, 144 L.Ed.2d 117 (1999); *Langham v. State*, 305 S.W.3d 568,

576 (Tex.Crim.App. 2010)(stating that whether a particular out-of-court statement is testimonial or not is a question of law which must be reviewed *de novo*).

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. Amend. VI; *Giles v. California*, 554 U.S. 353, 357-58, 128 S.Ct. 2678, 2682, 171 L.Ed.2d 488 (2008). The central purpose of the Confrontation Clause is to ensure the reliability of the evidence against an accused by subjecting it to rigorous testing in an adversary proceeding before the trier of fact. *Maryland v. Craig*, 497 U.S. 836, 845, 110 S.Ct. 3157, 3163, 111 L.Ed.2d 666 (1990). The Confrontation Clause contemplates that a witness who makes testimonial statements admitted against a defendant will ordinarily be present at trial for cross-examination. *Giles*, 554 U.S. at 358, 128 S.Ct. at 2682. If the witness is unavailable, his prior testimony will be introduced only if the defendant had a prior opportunity to cross-examine him. *Giles*, 554 U.S. at 358, 128 S.Ct. at 2682. The United States Supreme Court held in *Crawford v. Washington* that the Confrontation Clause is most naturally read as a reference to the right of confrontation at common law, admitting only those exceptions established at the time of the Founding. *Crawford v. Washington*, 541 U.S. 36, 54, 124 S.Ct. 1354, 1365-66, 158 L.Ed.2d 177 (2004). There are two common-law exceptions to the right of confrontation. *Giles*, 554 U.S. at 358, 128 S.Ct. at 2682-83. The first is a dying declaration, where the declarant makes a statement while on the verge of death. *Id.*, 554 U.S. at 358, 128 S.Ct. at 2683. The second is forfeiture by wrongdoing, which allows the admission of statements of a witness who was detained or kept away by the means or procurement of the defendant. *Id.*, 554 U.S. at 358-59, 128 S.Ct. at 2683. The United States Supreme Court held in *Giles* that the forfeiture by wrongdoing exception applies only if the defendant engaged in the wrongdoing with the intent to prevent the witness from testifying.

*See id.*, 554 U.S. at 361-62, 128 S.Ct. at 2684.

Sarahi's statements made to Officer Huante were admitted as a dying declaration. A dying declaration is a "statement made by a declarant while believing that the declarant's death was imminent, concerning the cause or circumstances of what the declarant believed to be impending death." TEX.R.EVID. 804(b)(2). This hearsay exception has been accepted under common-law tradition since before the drafting of the American Constitution. *Gardner v. State*, 306 S.W.3d 274, 290 (Tex.Crim.App. 2010). To satisfy the dying declaration exception, the victim's sense of impending death may be established in a number of ways, including her express words, her conduct, the severity of her wounds, the opinions of others stated to her, or any other relevant circumstances. *Gardner*, 306 S.W.3d at 292. Sarahi was bleeding profusely from the stab wounds and she told Officer Huante several times that she was dying. Huante believed, based on Sarahi's condition, that she was going into shock and her death was imminent if she did not receive medical care. The record supports the trial court's conclusion that Sarahi believed her death was imminent at the time she made the statements. *See Gardner*, 306 S.W.3d at 292.

Sarahi told Huante that she had gone voluntarily with Appellant but when she wanted to leave he refused to let her go. She also said that when her mother arrived and wanted her to leave, Appellant refused to let her leave the residence and he became angry and began to stab her. The trial court did not abuse its discretion by concluding that Sarahi's statements concerned not only the cause but also the circumstances of what she believed to be impending death. Assuming for the sake of argument that Sarahi's statements were testimonial, we conclude that the admission of this dying declaration did not violate Appellant's right to confrontation under the Sixth Amendment. *See Giles*, 554 U.S. at 358-59, 128 S.Ct. at 2682-83; *Crawford v.*

- 8 -

*Washington*, 541 U.S 36, 56 n.6, 124 S.Ct. 1354, 1367 n.6, 158 L.Ed.2d 177 (2004); *Gardner*, 306 S.W.3d at 288-89.  Issue One is overruled.

## JURY CHARGE ERROR

In Issue Two, Appellant complains that the trial court erred by failing to apply the law of concurrent causation to the facts of the case.  Appellant introduced evidence at trial that the medical treatment provided to the victim may have contributed to her death and he argues on appeal that she died as the result of medical malpractice.  The State responds that Appellant was not entitled to an instruction on concurrent causation because the evidence does not raise an issue that a concurrent cause was clearly sufficient to have caused the victim's death.

### *Standard of Review*

In reviewing charge error, we must first determine whether error exists.  *Druery v. State*, 225 S.W.3d 491, 504 (Tex.Crim.App. 2007).  If we find error, we must then determine whether the error caused sufficient harm to require reversal.  *Id*.  The standard of review differs depending on whether the defendant made a timely objection at trial.  *See Bluitt v. State*, 137 S.W.3d 51, 53 (Tex.Crim.App. 2004).  If the error was the subject of a timely objection, reversal is required if there is some harm to the defendant as a result of the error.  *See* TEX.CODE CRIM.PROC.ANN. art. 36.19 (West 2006); *Ovalle v. State*, 13 S.W.3d 774, 786 (Tex.Crim.App. 2000); *Almanza v. State*, 686 S.W.2d 157, 171 (Tex.Crim.App. 1985)(op. on reh'g).  If no proper objection was made at trial, reversal is required only if the error is so egregious that the defendant was denied a fair and impartial trial.  *See Ovalle*, 13 S.W.3d at 786; *Almanza*, 686 S.W.2d at 171.  Errors that result in egregious harm are those that affect the very basis of the case, deprive the defendant of a valuable right, or vitally affect a defensive theory.  *See Almanza*, 686 S.W.2d at 172.  The degree of harm is determined in light of the entire jury charge, the state

of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole. *See Almanza*, 686 S.W.2d at 171.

*Analysis*

The jury charge included the following abstract instruction on causation:

> A person is criminally responsible if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the actor clearly insufficient.

This paragraph tracks the language in Section 6.04(a) of the Penal Code. TEX.PENAL CODE ANN. § 6.04(a)(West 2011).[1] Section 6.04(a) requires the State to establish a "but for" causal connection between the defendant's conduct and the resulting harm. *Robbins v. State*, 717 S.W.2d 348, 351 (Tex.Crim.App. 1986).

The charge included only a general application paragraph for the offense of capital murder, stating:

> Now, if you find from the evidence beyond a reasonable doubt that on or about the 15th day of June, 2008, in El Paso County, Texas, the defendant, ROBERTO VALDEZ, did then and there intentionally cause the death of an individual, namely ANA SARAHI HERNANDEZ by stabbing ANA SARAHI HERNANDEZ about the body with a knife, and the defendant, ROBERTO VALDEZ, was then and there in the course of committing and attempting to commit the offense of Kidnapping of ANA SARAHI HERNANDEZ, then you will find the defendant, ROBERTO VALDEZ, GUILTY OF CAPITAL MURDER, as alleged in Count I of the indictment. (Verdict Form 'A').

> Unless you so find beyond a reasonable doubt, or if you have a reasonable doubt thereof, you will acquit the defendant, ROBERTO VALDEZ, of CAPITAL MURDER and next consider if the defendant is GUILTY of MURDER.

---

[1] Section 6.04(a) of the Texas Penal Codes states: "[a] person is criminally responsible if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the actor clearly insufficient." TEX.PENAL CODE ANN. 6.04(a).

Appellant did not object to the trial court's failure to address concurrent causation in the application paragraph.

An accused is entitled to a charge on every defensive issue raised by the evidence, regardless of whether it is strong, feeble, unimpeached, or contradicted. *Muniz v. State*, 851 S.W.2d 238, 254 (Tex.Crim.App. 1993). Conversely, the defendant is not entitled to an instruction that is not raised by the evidence. *Remsburg v. State*, 219 S.W.3d 541, 545 (Tex.App.--Texarkana 2007, pet. ref'd). To raise an issue of concurrent causation under Section 6.04(a), there must be evidence that: (1) the defendant's actions were clearly insufficient to produce the result; and (2) a concurrent cause was clearly sufficient to produce the result. TEX.PENAL CODE ANN. § 6.04(a); *Remsburg*, 219 S.W.3d at 545; *Hutcheson v. State*, 899 S.W.2d 39, 42 (Tex.App.--Amarillo 1995, pet. ref'd).

There is no evidence that Appellant's actions were clearly insufficient to cause the victim's death. To the contrary, both Dr. Contin and Appellant's expert, Dr. Grossberg, testified that Sarahi bled to death as the result of multiple stab wounds. While Dr. Grossberg questioned whether placement of the left chest tube might have caused an injury to the left lung and resultant bleeding, she did not testify that the stab wounds were clearly insufficient to cause Sarahi's death. In the absence of such evidence, Appellant was not entitled to any instruction on concurrent causation. Issue Two is overruled.

**LEGAL SUFFICIENCY**

In his third issue, Appellant argues that the evidence was legally insufficient to prove that he intentionally or knowingly kidnapped, or attempted to kidnap Sarahi Hernandez.[2]

*Standard of Review*

The legal sufficiency standard articulated in *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), is the only standard a reviewing court applies in determining whether the evidence is sufficient to support a conviction. *Brooks v. State*, 323 S.W.3d 893, 894-95 (Tex.Crim.App. 2010). Under the *Jackson* standard, a reviewing court must consider all evidence in the light most favorable to the verdict and in doing so determine whether a rational justification exists for the jury's finding of guilt beyond a reasonable doubt. *Brooks*, 323 S.W.3d at 894-95, *citing Jackson*, 443 U.S. at 319, 99 S.Ct. at 2789. As the trier of fact, the jury is the sole judge as to the weight and credibility of witness testimony, and therefore, on appeal we must give deference to the jury's determinations. *Brooks*, 323 S.W.3d at 894-95. If the record contains conflicting inferences, we must presume the jury resolved such facts in favor of the verdict and defer to that resolution. *Id.* On appeal, we serve only to ensure the jury reached a rational verdict. We may not reevaluate the weight and credibility of the evidence produced at trial and in so doing substitute our judgment for that of the fact finder. *King v. State*, 29 S.W.3d 556, 562 (Tex.Crim.App. 2000). In our review, we consider both direct and circumstantial evidence and all reasonable inferences that may be drawn from the evidence. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex.Crim.App. 2007). The standard of review as to the sufficiency of the evidence is the same for both direct and circumstantial evidence cases. *Id.*; *Arzaga v. State*, 86 S.W.3d 767, 777 (Tex.App.--El Paso 2002, no pet.). Each fact need not point directly and

---

[2] Appellant challenges only the legal sufficiency of the evidence to prove kidnapping; he does not challenge the sufficiency of the evidence to prove he murdered Sarahi by stabbing her with a knife.

independently to the guilt of the accused, so long as the cumulative force of all the evidence, when coupled with reasonable inferences to be drawn from that evidence, is sufficient to support the conviction. *Id.*

*Applicable Law*

Count I of the indictment charged Appellant with capital murder. It alleged that he intentionally caused the death of Sarahi Hernandez by stabbing her with a knife while "in the course of committing and attempting to commit the offense of kidnapping." A person commits capital murder if he intentionally or knowingly causes the death of an individual while in the course of committing or attempting to commit kidnapping. TEX.PENAL CODE ANN. §§ 19.02(b)(1), 19.03(a)(2)(West 2011). The State is not required to prove that Appellant completed a kidnapping because a person can be guilty of capital murder if the State can show the murder occurred during an attempt to commit kidnapping. TEX.PENAL CODE ANN. § 19.03(a)(2). Criminal attempt requires both the commission of an act that amounts to more than mere preparation and a specific intent to commit the offense. TEX.PENAL CODE ANN. § 15.01 (West 2011).

A person commits the offense of kidnapping when he "intentionally or knowingly abducts another person." TEX.PENAL CODE ANN. § 20.03(a). "Abduct" is defined as restraining "a person with intent to prevent his liberation by: (A) secreting or holding him in a place where he is not likely to be found; or (B) using or threatening to use deadly force." *Id.* at § 20.01(2). "Restrain" is defined as restricting "a person's movements without consent, so as to interfere substantially with the person's liberty, by moving the person from one place to another or by confining the person." *Id.* at § 20.01(1). Restraint is without consent if it is accomplished by force, intimidation, or deception. *Id.* at § 20.01(1)(A). There is no specific time requirement

for determining whether a person has been restrained. *Hines v. State*, 75 S.W.3d 444, 447-48 (Tex.Crim.App. 2002). It is up to the jury to distinguish between those situations in which a substantial interference with the victim's liberty has taken place and those situations in which a slight interference has taken place. *Id*. at 448. The offense of kidnapping is legally completed when the defendant, at any time during the restraint, forms the intent to prevent liberation by secreting or holding another in a place unlikely to be found or by using or threatening to use force. *Laster v. State*, 275 S.W.3d 512, 521 (Tex.Crim.App. 2009); *Clark v. State*, 24 S.W.3d 473, 476 (Tex.App.--Texarkana 2000, no pet.).

To show that Appellant kidnapped or attempted to kidnap Sarahi Hernandez, the State had the burden of proving that: (1) Appellant restrained Sarahi or accomplished more than mere preparation for restraint; (2) the restraint was without Sarahi's consent; and (3) Appellant acted with the specific intent to prevent Sarahi's liberation by either secreting her in a place where she was unlikely to be found or by using or threatening to use deadly force to restrain her. *See* TEX.PENAL CODE ANN. §§ 20.01(1), (2), 20.03(a); *Saldana v. State*, 59 S.W.3d 703, 708 (Tex.App.--Austin 2001, pet. ref'd).

*Evidence of Restraint*

Appellant first argues that there is no evidence of restraint other than Sarahi's dying declaration which he refers to as inadmissible. Even if we had sustained Appellant's challenge to the admissibility of this evidence in Issue One, we are required to consider all of the evidence, including inadmissible evidence, in our sufficiency review. *See Russeau v. State*, 171 S.W.3d 871, 879 n.2 (Tex.Crim.App. 2005). Appellant also focuses on the evidence that Sarahi was voluntarily at his house and no one saw her being restrained. The fact that Sarahi initially accompanied Appellant voluntarily to his house does not preclude the possibility that kidnapping

- 14 -

subsequently occurred. *See Rodriguez v. State*, 730 S.W.2d 75, 79 (Tex.App.--Corpus Christi 1987, no pet.). Likewise, Appellant's friends did not observe Sarahi being held against her will at 3 a.m. when they left Appellant's house, but that does not foreclose the possibility that the restraint on her liberty occurred after Gausin and Martinez left. In fact, Jorge Cardenas spoke with Sarahi at around 3 a.m. and he understood that Appellant was going to drive Sarahi back to Jorge's house and drop her off, but she never arrived. Sarahi told Office Huante that she wanted to leave but Appellant would not let her go. Similarly, Appellant told Crystal that he was going to let Sarahi leave until she and her mother arrived at the house. This supports two inferences. First, Appellant's statement that he was going to let Sarahi leave indicates that it was his decision whether and when she could leave. Second, the jury could have found that Appellant refused to let Sarahi leave after her mother and sister arrived at his house. We conclude that a rational trier of fact could find beyond a reasonable doubt Appellant restricted Sarahi's movements and substantially interfered with her liberty by confining her to his home.

*Lack of Consent*

There is also legally sufficient evidence that the restraint was without Sarahi's consent. Sarahi told Officer Huante that she wanted to leave but Appellant would not let her go. When Crystal looked through the window and saw Appellant telling Sarahi "no" while "getting in her face," she knocked on the window to let them know she was there. At that moment, she saw fear in Sarahi's eyes. Crystal ran to tell her mother to call the police and she heard Sarahi running through the house and screaming, "No, Roberto, no." Sarahi had stab wounds to the left side of her back and the back of one of her legs. One inference from this evidence is that Appellant stabbed Sarahi while she was fleeing from him and trying to leave the house with her family. Further, when Crystal went into the bedroom upstairs, she saw Appellant holding Sarahi by the

- 15 -

hair with one hand and the knife in the other hand. The jury could have reasonably concluded beyond a reasonable doubt that Appellant restrained Sarahi without her consent through force and intimidation. *See Megas v. State*, 68 S.W.3d 234, 239 (Tex.App.--Houston [1st Dist.] 2002, pet. ref'd)(holding evidence legally sufficient to prove victim was restrained against her will where the defendant assaulted the victim to prevent her from leaving his car).

*Specific Intent to Prevent Liberation*

Finally, we consider whether Appellant acted with the specific intent to prevent Sarahi's liberation by either secreting her in a place where she was unlikely to be found or by using or threatening to use deadly force to restrain her. There is evidence that neither Maria nor Crystal knew where Appellant lived. Fortunately, Jorge knew that Sarahi had been with Appellant when he last spoke with her, and Sarahi's friend, Brenda, knew the street where Appellant lived. They were able to find his house only because they recognized his car parked in the driveway. When they went to the door and knocked repeatedly at 9 a.m. and noon, Appellant did not answer the door. This is some evidence that Appellant intended to restrain Sarahi by secreting her in a place where she was unlikely to be found. *See Laster*, 275 S.W.3d at 522.

Additionally, there is evidence that Appellant intended to prevent Sarahi's liberation by using or threatening to use deadly force to restrain her. Immediately after Crystal knocked on the window and told her mother to call the police, Sarahi began running through the house while screaming "No, Roberto, no." Appellant stabbed Sarahi nine times before Crystal could enter the house. When Crystal entered the bedroom, she saw that Appellant was holding Sarahi by the hair with one hand while holding a knife in the other hand. Crystal tried to go to her sister's aid, but Appellant slashed the knife at Crystal and cut her. Appellant dropped the knife only when police officers entered the room and commanded him to do so. From this evidence, the jury

could have rationally concluded beyond a reasonable doubt that Appellant acted with the specific intent to prevent Sarahi's liberation by using and threatening to use deadly force to restrain her. Issue Three is overruled. Having overruled all three issues presented on appeal, we affirm the judgments of conviction related to Counts I and II.

October 17, 2012                    _____
                                    ANN CRAWFORD McCLURE, Chief Justice

Before McClure, C.J., Rivera, and Antcliff, JJ.

(Do Not Publish)